UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| JULIA WATSON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | Civil Action No.: 1:23-cv-522 |
| | ) | [Jury Trial Demanded] |
| DUKE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff, JULIA WATSON, by and through undersigned counsel, and complains against Defendant DUKE UNIVERSITY, as follows:

**INTRODUCTION AND NATURE OF THE CASE**

Plaintiff brings this action against Defendant for disability discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. Plaintiff seeks all remedies available under law, including but not limited to, declaratory relief, injunctive relief, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, and costs as authorized by law.

**JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and under 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2. This Court has personal jurisdiction over Defendants because it operates within the State of North Carolina and within this District.

1

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

5. Plaintiff Julia Watson ("Plaintiff" or "Ms. Watson") is a citizen and resident of Jefferson County, Alabama. At all times relevant to this Complaint, Ms. Watson was a citizen of Wake County and was employed by Defendant Duke University ("Duke" or "Defendant"), as a Clinical Research Coordinator.

6. At all times relevant to this Complaint, Ms. Watson was an "employee" as defined by the ADA.

7. Duke University is a non-profit corporation and is authorized to do business in the State of North Carolina under the name Duke University with its principal place of business located at 310 Blackwell Street, 4th Floor, Box 104124, Durham, North Carolina 27710. Defendant receives federal assistance and is therefore subject to the provisions of the Rehabilitation Act of 1973.

8. Upon information and belief, at all times relevant hereto, Defendant has employed more than five-hundred employees; and therefore, is a "covered entity" and "employer" as defined by the ADA and, at all times relevant hereto, employed Ms. Watson.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Ms. Watson timely executed and filed a Charge of Discrimination with the Raleigh Area Office of the Equal Employment Opportunity Commission ("EEOC") on December 15, 2022,

alleging violations of her federally protected civil rights, including disability discrimination and retaliation.

10. The EEOC issued Ms. Watson a Notice of Right to Sue on March 30, 2023.

11. Ms. Watson complied with all deadlines relating to the investigation of her formal administrative complaint and all conditions precedent to the institution of this lawsuit have been fulfilled pursuant to 42 U.S.C. § 12117(a) and 42 U.S.C. §§ 2000e-5(b), (f)(1).

## FACTUAL ALLEGATIONS

12. Ms. Watson has struggled with chronic depression and recurrent migraines since she was a teenager. She has been formally diagnosed and continues to medically treat for these chronic conditions.

13. In addition, in 2021, Ms. Watson's physician diagnosed her with both postural orthostatic tachycardia syndrome ("POTS") and fibromyalgia. POTS is a chronic illness that causes rapid heart rate, as well as dizziness and fatigue with change of position. Fibromyalgia is a chronic illness that causes severe pain and tenderness throughout the body including tension headaches, anxiety, and depression. Ms. Watson has medically treated for each of these conditions since receiving her diagnoses.

14. Ms. Watson applied for a position with Duke in 2022. Specifically, she applied for a clinical research coordinator ("CRC") position at the Duke University Medical Center, School of Medicine, Department of Anesthesiology. When she applied for the position, Ms. Watson possessed the skills, education, and experience required to perform the job duties.

15. Duke management representatives, Tiffany Bisanar and Bonita Hilliard, interviewed Ms. Watson for the position. During the interview, Ms. Watson asked if the CRC position offered flexible scheduling and the ability to work from home. Ms. Bisanar and Ms.

3

Hilliard responded affirmatively, indicating that the position was flexible and referred to the flexibility in one's schedule and assigned hours.

16. In May 2022, Defendant formally offered Ms. Watson the CRC position, which she accepted. Ms. Watson's assigned schedule was set as Sunday through Thursday, 9 a.m. to 5 p.m.

17. Ms. Watson started in her new position for Defendant on June 21, 2022. In the CRC position, Ms. Watson worked exclusively with Duke Cancer Institute's Cancer Patient Experience Research Program. Specifically, Ms. Watson coordinated research studies on cancer patients' experiences as well as palliative care research by, including but not limited to, employing and developing research strategies for screening and recruitment; maintaining recruitment and retention rates; interacting with study subjects; collecting data to determine appropriate study feasibility, recruitment and retention strategies; evaluating processes to identify issues related to recruitment and retention rates, as well as other responsibilities. The essential functions of the job included but were not limited to data collection and management and developing strategies for the screening and recruitment of study candidates. At all times relevant hereto, Ms. Bisanar supervised Ms. Watson in the CRC position.

18. Out of concern for her medical issues and knowing she had upcoming medical appointments scheduled, Ms. Watson asked Ms. Bisanar about Duke's process for documenting disabilities. Ms. Bisanar advised her to visit Defendant's Employee Occupational Health and Wellness Clinic. Ms. Watson scheduled an appointment and was seen in the Wellness Clinic.

19. From her start date, Ms. Watson attended mandatory training for the CRC position, and she completed it in September 2022. Upon completion, she began working her assigned schedule of Sunday through Thursday, working remotely on Sundays.

20. In September 2022, Ms. Watson scheduled another appointment at the Wellness Clinic and was seen by Dr. Lee. Dr. Lee requested physician documentation of Ms. Watson's disabilities, and Ms. Watson provided it. Dr. Lee and Ms. Watson's physicians all expressed Ms. Watson's need for accommodations, including the need to work remotely when her symptoms were significant or flaring.

21. At the beginning of November 2022, Defendant denied Ms. Watson's request for disability accommodations. Defendant provided no alternative disability accommodations. Instead, Defendant put Ms. Watson on unpaid leave and placed her in Defendant's reassignment pool so she could search for and apply for another position with Defendant.

22. Ms. Watson did not understand why Defendant flatly denied her any and all disability accommodations. Her disabilities were clearly documented, and she had provided the required documentation to Defendant. On November 7, 2022, Ms. Watson met with her supervisor and Ms. Exum.

23. During the meeting, Ms. Watson told Ms. Bisanar and Ms. Exum that she had been informed during her interview the CRC position was flexible with scheduling and hours. They informed her, for the first time, that the CRC was an on-site only position. No one had told Ms. Watson that prior to her hire, in fact, she inquired, and was told the opposite.

24. Ms. Watson also indicated that she was already working remotely one day a week without issue and that many of her coworkers worked from home at least two days a week as she had specifically observed during her time in the office. She expressed to them she could not understand how her non-disabled coworkers were allowed to work remotely, but she was not. She told them she believed the decision was the result of discrimination.

25. With respect to being placed on unpaid leave, Ms. Watson asked whether she could search for an alternative position while still working in the CRC position. Defendant flatly refused. Ms. Watson's forced, unpaid leave officially began on November 11, 2022.

26. As a part of being placed in the reassignment pool, Defendant's Transition Services was assigned to assist Ms. Watson with identifying another suitable position with Defendant. Jemma Boler ("Boler") of Transition Services was assigned to assist Ms. Watson.

27. However, shortly after being placed on unpaid leave, Defendant revoked Ms. Watson's access to Duke Careers, Defendant's internal portal for Duke employees to search for other positions within the company. Apparently, Defendant no longer considered Ms. Watson an employee, and thus, Defendant quietly terminated Ms. Watson. Indeed, Defendant's further actions confirm that Ms. Watson was required to apply for positions as if she were *not* employed by Defendant, and she even competed for positions with external applicants.

28. As a part of Defendant's purported reassignment, Ms. Watson was informed she would receive preferential treatment in her job search, that is, her qualifications and applications would be sent directly to the hiring managers for the open positions rather than going through the external applicant's lengthier process. When Ms. Watson asked Boler to confirm that she was receiving this preference, Boler refused to respond. Ms. Watson never received any confirmation that such preferential treatment for her submissions actually occurred.

29. In addition, contrary to her role, Boler did not provide much assistance to Ms. Watson. Indeed, Boler sent a job posting (one for which Ms. Watson was qualified and wanted to apply) to another candidate. As a result, Ms. Watson was unable to apply for this position even though she possessed the necessary qualifications, skills, and training.

30. At one point another CRC position became vacant, one that consisted solely of remote work, and for which Ms. Watson was more than qualified. Ms. Watson informed Boler about this position as well as her interest in applying for it, and Boler responded that Ms. Watson's reassignment would depend on her attitude, which she opined was "unpleasant." Boler told Ms. Watson she should apply for lower paying positions, positions for which Ms. Watson was overqualified.

31. While in Defendant's reassignment pool, Ms. Watson applied for at least 21 positions with Defendant; Defendant rejected her for every one of them. In light of the barriers Defendant had placed to her reassignment within the company, it became clear to Ms. Watson that Defendant did not want her to obtain another position with the company. Upon information and belief, the positions for which Ms. Watson applied and was qualified, those positions were filled with non-disabled persons who did not possess Ms. Watson's qualifications.

32. Ms. Watson remained in Defendant's reassignment pool until May 2023. At that time, Defendant sent Ms. Watson a notice inquiring whether she wished to extend her personal leave even further. By this time, due to receiving no pay for many months, Ms. Watson could no longer afford to pay her living expenses. As a result, she had no choice but to move back in with her parents who resided in Alabama.

33. Defendant discriminated against Ms. Watson by refusing to accommodate her documented disabilities; by refusing or failing to engage in the interactive process with Ms. Watson; by failing in bad faith to offer alternative accommodations to Ms. Watson; by claiming that working remotely was not a reasonable accommodation because the CRC position was an "on-site only" position, when Defendant had represented otherwise to Plaintiff in her interview

7

and Plaintiff already worked one day a week remotely, and Plaintiff's co-workers also worked remotely.

34. Defendant retaliated against Ms. Watson for engaging in the protected activities of requesting disability accommodations and complaining that the Defendant's decision to flatly refuse to accommodate her was the result of discriminatory animus. After engaging in said protected activities, Defendant placed Ms. Watson on forced, unpaid leave indefinitely, and, as discussed above, put numerous barriers in place to prevent Ms. Watson from securing another position with Defendant. Such actions resulted in Plaintiff being constructively discharged, that is, being on indefinite unpaid leave forced her into such financial distress that she had no choice but to leave North Carolina and move in with her parents in Alabama.

35. Defendant's acts of discrimination and/or retaliation against Ms. Watson directly proximately, and foreseeably resulted in Ms. Watson suffering damages, including but not limited to, back pay, front pay, out of pocket expense, relocation expenses, compensatory damages, mental distress, anguish, anxiety, attorneys' fees, costs, as well as any other damages proven at trial.

**FIRST CLAIM FOR RELIEF**
**Discrimination In Violation of the Americans With**
**Disabilities Act, As Amended, 42 U.S.C. § 12101 *et seq*.**
**Violations of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.**

36. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

37. Based upon information and belief, Defendant has employed more than five-hundred employees and is a "covered entity" and "employer" as defined by the ADA and is subject to the ADA. It also receives federal funds and thus is a public entity subject to the requirements of the Rehabilitation Act.

38. Ms. Watson suffers from POTS, fibromyalgia, migraines, depression, and anxiety. These conditions constitute physical and/or mental impairments that substantially limits one or more life activities of Ms. Watson, including but not limited to, performing manual tasks, walking, standing, lifting, bending speaking, concentrating, thinking, and communicating. Ms. Watson is a qualified individual pursuant to ADA because she suffers from these physical and/or mental impairment(s) which substantially limits one or more major life activities of Ms. Watson including but not limited to, performing manual tasks, walking, standing, lifting, bending, speaking, concentrating, thinking, and communicating.

39. Ms. Watson performed the essential functions of the job prior to requesting accommodations and could continue to perform the essential functions of the job if provided reasonable accommodations for her disabilities such as flexible scheduling and/or remote work.

40. Notwithstanding that she had been performing the essential functions of her job, Ms. Watson was placed on forced, unpaid leave upon requesting disability accommodations even though reasonable accommodations were available at that time (such as flex hours and the ability to work from home) and such conditions were provided to other non-disabled employees. Defendant also provided no alternative disability accommodations, which evidences Defendant's bad faith.

41. While on forced, unpaid leave due to her disabilities, Ms. Watson applied for numerous positions with Defendant for which she was qualified but Defendant rejected, such as Clinical Research Coordinator, Research Administrative Specialist and Research Administrative Specialist.

42. Upon information and belief, a less qualified individual without a disability was hired for each position to which Ms. Watson applied and was qualified but was rejected. Clearly, Ms. Watson would have been hired but for her disabilities.

43. Furthermore, upon information and belief, other employees subject to reassignment who had no disabilities were provided preferential treatment in their applications for jobs within Defendant. Such treatment was denied to Ms. Watson notwithstanding Defendant informing her that it would provide same. Defendant also hampered Ms. Watson's attempts to find and apply for jobs for which she was qualified based upon her disabilities when other non-disabled employees, upon information and belief, were not so hampered. Defendant also wrongfully revoked Ms. Watson's access to Duke Careers and hindered her ability to apply for positions internally as a Duke employee during her reassignment process although she was never formally terminated. Other non-disabled employees, upon information and belief, did not have their access wrongfully revoked.

44. Defendant discriminated against Ms. Watson based on her disabilities in violation of the Acts when it refused the reasonable accommodation of working remotely or flex as needed. Many of Ms. Watson's coworkers worked remotely and Defendant did not articulate how allowing Ms. Watson to work remotely as needed would impact the essential functions of the job and/or create an undue hardship for Defendant.

45. Defendant discriminated against Ms. Watson based on her disabilities in violations of the Acts when it failed to provide alternative accommodations for Ms. Watson after refusing Ms. Watson's proposed accommodation of intermittent remote work. Defendant acted in bad faith when it refused to accommodate Ms. Watson's disabilities and/or engage in the interactive process with her or suggest reasonable alternative accommodations to those it refused.

46. Defendant discriminated against Ms. Watson based on her disabilities in violation of the Acts when it failed to provide her preferential treatment in the reassignment pool as well as hampered her attempts to find and apply for other jobs for Defendant and revoked Ms. Watson's access to Duke Careers and hindered her ability to apply for positions internally as a Duke employee during her reassignment process although she was never formally terminated.

47. As a direct, foreseeable, and proximate result of Defendant's violation of the Acts as described herein, Ms. Watson has suffered and continues to suffer emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

48. As a further direct, foreseeable, and proximate result of Defendant's violation of the Acts as described herein, Ms. Watson has suffered and continues to suffer pecuniary losses in the form of, *inter alia*, lost income, interest, and benefits.

## SECOND CLAIM FOR RELIEF
### Retaliation In Violation of the Americans With Disabilities Act, As Amended (ADA), 42 U.S.C. § 12101 *et seq*. and of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.

49. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

50. Based upon information and belief, Defendant has employed more than five-hundred employees and is a "covered entity" and "employer" as defined by the ADA and is subject to the ADA. It also receives federal funds and thus is a public entity subject to the requirements of the Rehabilitation Act.

51. On October 13, 2022, Ms. Watson engaged in a protected activity when she requested accommodations due to her disabilities. She engaged in further protected activities each time she demanded accommodations of her disabilities and when she complained that the denial of accommodations by Defendant was the result of discriminatory animus.

52. Ms. Watson sought accommodations for her disabilities and expressed her concerns with Defendant, through Program Coordinator Exum, that she believed she was discriminated against as a result of disability, based on Defendant's denial of her accommodations.

53. Following Ms. Watson's request for accommodation, Defendant forced Ms. Watson on unpaid leave and placed her in the reassignment pool.

54. Transition Services failed to provide Ms. Watson with adequate assistance during her job search and withheld positions that suited Ms. Watson's experience, skills, and training.

55. Defendant wrongfully revoked Ms. Watson's access to Duke Careers and hindered her ability to apply for positions internally as a Duke employee during her reassignment process although she was never formally terminated.

56. Ms. Watson was constructively discharged by Defendant in that Defendant's placing her on unpaid leave indefinitely caused so much financial strain that she had no choice but to move in with her parents in another state.

57. Defendant retaliated against Ms. Watson when Ms. Watson filed a request for accommodation with Disability Management based on her disabilities.

58. As a direct, proximate, and foreseeable result of Defendant's violations of the Acts as described herein, Ms. Watson has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

59. As a direct, proximate, and foreseeable result of all of Defendant's violations of the Acts and/or omissions as set forth herein, Defendant is liable to Ms. Watson for all damages sustained due to Defendant's retaliation and she is entitled to all remedies authorized by law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, and attorneys' fees.

## THIRD CLAIM FOR RELIEF
**Punitive Damages**

60. Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

61. Defendant's acts as alleged hereinabove were committed with either an evil motive and/or with reckless and wanton disregard for the rights of Ms. Watson to be free from discrimination and/or retaliation.

62. Defendant's refusal to engage in the interactive process with Ms. Watson and its refusal to offer alternative accommodations to her are evidence of Defendant's bad faith.

63. On November 11, 2022, Defendant forced Ms. Watson on unpaid leave following her request for accommodations.

64. Defendant refused to reassign Ms. Watson to a new position and denied her attempts to be reassigned with Defendant.

65. As described hereinabove, Defendant acted willfully, consciously, and intentionally disregarded and/or showed reckless indifference to Ms. Watson's constitutional rights to be free from discrimination and retaliation based on her disabilities.

66. As a direct, proximate, and foreseeable result of Defendant's intentional, reckless and/or willful and wanton conduct, Ms. Watson has suffered and continues to suffer damages, including emotional distress, pain and suffering, mental anguish, loss of enjoyment of life and other nonpecuniary damages.

67. Based on the foregoing and, pursuant to N.C. Gen. Stat. § 1D-15, Ms. Watson is entitled to recover punitive damages from Defendant.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court for judgement against Defendant to the full extent permitted by federal and/or state law including but not limited to, the following:

1. Judgment in Plaintiff's favor determining that Defendant's actions and conduct relating to Plaintiff violated the Americans with Disabilities Act and/or the Rehabilitation Act;

2. Judgment in Plaintiff's favor determining that Defendant retaliated and constructively discharged the Plaintiff;

3. Award Plaintiff back pay, front pay, and all other pecuniary damages incurred, including but not limited to lost salary, interest and benefits;

4. Award Plaintiff damages for mental anguish, emotional distress, pain and suffering, loss of enjoyment of life, inconvenience, medical bills and all other non-pecuniary, compensatory damages;

5. Award Plaintiff punitive damages as allowed by law;

6. Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees and expert witness fees incurred by Plaintiff in filing and prosecuting this action;

7. For an award of pre- and post-judgment interest to Plaintiff on all damages; and

8. For all other further relief as this Court deems just and appropriate.

Respectfully submitted, this the 28th day of June, 2023.

[SIGNATURE TO FOLLOW ON NEXT PAGE]

**GREEN MISTRETTA LAW, PLLC**

/s/ Tahlia D. Cypress
Tahlia D. Cypress, N.C. State Bar No. 57862
Dawn T. Mistretta, N.C. State Bar No. 31691
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587
Telephone: (919) 278-7453
Facsimile: (855) 876-8893
tcypress@gmlawyers.org
dmistretta@gmlawyers.org
*Counsel for Plaintiff*